**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
(Charleston Division)**

| | |
|---|---|
| HAROLD THOMAS ROGERS, MIRANDA LACY, THE NATIONAL FEDERATION OF THE BLIND, and THE NATIONAL FEDERATION OF THE BLIND OF WEST VIRGINIA, | |
| Plaintiffs, | **Case No.:** 2:25-cv-00182 |
| v. | |
| WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, E. GORDON GEE, in his official capacity as President of West Virginia University, and DEANA MORROW, in her official capacity as Director of the West Virginia University School of Social Work, | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Harold Thomas Rogers, Miranda Lacy, the National Federation of the Blind ("NFB"), and the National Federation of the Blind of West Virginia ("NFBWV"), by their undersigned counsel, file this Complaint against Defendants West Virginia University Board of Governors, E. Gordon Gee, and Deana Morrow for denying blind students an equal opportunity to participate in and benefit from West Virginia University's ("WVU") programs and activities in violation of federal law. They allege as follows:

## INTRODUCTION

1.      Plaintiff Harold Thomas Rogers is a student in the Master of Social Work online, part-time program at WVU. Prior to enrolling at WVU, Mr. Rogers earned a Bachelor of Science in Social Work from West Virginia State University. He chose to attend WVU for his master's

degree because of WVU's position as one of the leading social work schools in the country, and his undergraduate studies in social work qualified him for WVU's Advanced Standing degree option, shortening his program completion time from three years to two years.

2.    Mr. Rogers's career goal is to become a licensed clinical social worker in West Virginia to counsel and support individuals in his home state. To that end, he became one of only twenty-three rural integrated behavioral health trainees in the country through a program funded by the United States Health Resources and Services Administration.

3.    Plaintiff Miranda Lacy is a student in WVU's Master of Social Work online, part-time, three-year program. Ms. Lacy graduated with honors from West Virginia State University with a Bachelor of Science in Psychology.

4.    Ms. Lacy is passionate about working with people with disabilities. She is an experienced advocate for people with disabilities and hopes to continue her work for this community. She is also interested in working with children and domestic violence victims and is hoping to learn more about supporting these populations through the next experiential field placement she will complete at WVU. Ms. Lacy is a West Virginia native and plans to serve the West Virginia community.

5.    Mr. Rogers and Ms. Lacy are blind and use assistive technology to complete their academic work and to navigate the world in their personal lives.

6.    Their assistive technology includes screen-reader applications, such as Job Access With Speech ("JAWS") for Windows or VoiceOver for Apple devices, which monitor the computer screen and convert the textual information displayed into synthesized speech or into Braille on a device known as a "refreshable Braille display."  Screen-reader programs also allow blind individuals to navigate through websites and applications using the keyboard, rather than a

mouse, which requires vision. Screen magnification, such as Fusion software, increases the size of the images on a screen so someone with limited vision can read it visually. These technologies enable blind individuals to read documents, access online content, review and send email, and remain as productive as their sighted peers on their computers and mobile devices.

7.      Digital books, materials, websites, mobile applications and other technology need to be coded properly in order to interact effectively with assistive technology such as screen readers. For example, PDF documents must be "tagged" properly in order to convey the correct reading order to assistive software. Images in documents and in websites need to have "alternative text" describing the images that screen readers can read aloud to a blind person. Buttons and fillable fields need to have screen readable labels to inform blind users what the button or field is for. And sites and documents need to be coded to be navigable using a keyboard instead of a mouse.

8.      Mr. Rogers uses a combination of screen magnification and screen reading software to read text displayed on his computer and mobile devices, and Ms. Lacy uses screen readers on her computer and mobile devices.

9.      Mr. Rogers and Ms. Lacy have spent their entire higher education careers in West Virginia. They chose to complete their graduate studies in social work at WVU, believing that the University's masters-level program would best prepare them for their careers as social workers serving the West Virginia population.

10.      Instead, WVU has failed to provide them with an opportunity equal to that of their sighted peers to access course materials, educational technology, and field placement experiences. WVU's denial of equal access to course materials and educational technology stems in part from its procurement of web software platforms that are not accessible to blind students

and that, therefore, exclude blind students from WVU's programs and activities. Further, the University's failure to provide Mr. Rogers and Ms. Lacy with accessible field placement opportunities has thwarted their ability to complete a cornerstone degree requirement and receive vital, real-world training as social workers. As a result, WVU has denied Mr. Rogers and Ms. Lacy the opportunity to learn in an equally effective and integrated manner alongside their sighted peers.

## JURISDICTION & VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, et seq., and Section 504 of Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

12.    Mr. Rogers and Ms. Lacy are residents of Charleston, West Virginia, and they take their classes in WVU's online Master of Social Work program from their homes. Therefore, the acts and injuries complained of herein occurred in Charleston, West Virginia.

13.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because WVU does business in this district, the acts constituting violations of the ADA and Section 504 occurred in this district, and Mr. Rogers and Ms. Lacy reside in this district.

## PARTIES

14.    Plaintiff Harold Thomas Rogers entered the online, two-year Master of Social Work program at WVU in the fall of 2022. Prior to his matriculation at WVU, he graduated with honors from West Virginia State University with a Bachelor's Degree in Social Work. At West Virginia State University, Mr. Rogers was the president of a disability-awareness student organization, and he was a member of Alpha Delta Mu, a Social Work National Honor Society.

15.    Before facing disability discrimination at WVU, Mr. Rogers had a 4.0 grade point average. He is one of only twenty-three rural integrated behavioral health trainees nationwide.

16.    Mr. Rogers was born with retinopathy of prematurity, an eye condition caused by premature birth in which abnormal blood vessels grow in the retina. He has no vision in his left eye and has an extremely limited visual field in his right eye.

17.    Plaintiff Miranda Lacy entered the online, three-year Master of Social Work program at WVU in the fall of 2023. Her academic performance and potential earned her a scholarship through the NFB. Before beginning at WVU, Ms. Lacy graduated with honors from West Virginia State University, where she was a member of Psi Chi, the international honor society for psychology.

18.    Ms. Lacy has retinitis pigmentosa, a genetic eye condition causing cells to break down in the retina. She has experienced progressive vision loss throughout her life and became totally blind in 2023.

19.    Plaintiff NFB, the oldest and largest national organization of blind persons, is a 501(c)(3) non-profit corporation duly organized under the laws of the District of Columbia and headquartered in Baltimore, Maryland. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. The NFB has 38 members in West Virginia, some of whom attend WVU or will want to attend WVU in the future.

20.    The NFB and its affiliates are widely recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families. The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into

society on terms of equality and by removing barriers that result in the denial of opportunity to

blind persons in virtually every sphere of life, including education, employment, family and

community life, transportation, and recreation.

21.    As part of its mission and to achieve these goals, the NFB actively pursues

litigation, policy advocacy, counseling and referrals, training, and mentoring for students with

disabilities, and works with institutions of higher education, teachers, testing entities, and

educational technology providers to ensure that the blind receive equal access to higher

education. For example, the NFB each year provides over $250,000 in college scholarships to

blind students to attend institutions of higher education. The NFB also provides resources

regarding higher education, including handbooks on rights and self-advocacy in higher education

and high stakes testing. The National Association of Blind Students is a division of the NFB that

seeks to empower blind students to live the lives they want through organized activism,

mentorship, leadership development, resource sharing and more.

22.    Mr. Rogers and Ms. Lacy are members of the NFB.

23.    NFBWV is a 501(c)(3) nonprofit that comprises the West Virginia State affiliate

of the NFB. NFBWV's members are blind individuals who advocate as a group for increased

access and inclusion for the blind in the State of West Virginia. NFBWV includes in its

membership blind individuals who attend WVU or will take part in WVU's programs and classes

in the future.

24.    NFBWV sues on behalf of its members and in furtherance of its extensive efforts

and expenditure of resources in advancing its mission to improve independence of the blind.

Discrimination against blind individuals frustrates the mission of NFBWV and results in the

diversion of its resources to address WVU's discriminatory practices. NFBWV works with blind

students to support them in their higher education journeys, to advocate for Vocational

Rehabilitation and other resources, and to provide mentoring. NFBWV offers scholarships to

students attending or planning to attend higher education institutions.

25.     Mr. Rogers and Ms. Lacy are members of NFBWV.

26.     Defendant West Virginia University Board of Governors is the institutional

governing body of WVU and may sue and be sued pursuant to W. Va. Code § 18-11-1.

27.     WVU is a public educational entity organized and existing pursuant to the laws

of the State of West Virginia. *See* W. Va. Code § 18B-1-1 *et seq.* Therefore, it is a government

entity subject to Title II of the ADA, 42 U.S.C. § 12131, *et. seq*.

28.     WVU receives federal financial assistance in many forms, including, but not

limited to, direct grants of assistance and student financial aid, and is therefore required to

comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

29.     As a condition of receiving federal funds from the United States Department of

Education, WVU annually signs a Certificate of Compliance certifying that it is in compliance

with Section 504 of the Rehabilitation Act.

30.     Defendant E. Gordon Gee is the President of WVU.

31.     Defendant Deana Morrow is the Director of WVU's School of Social Work.

### **FACTUAL ALLEGATIONS**

32.     As technology and digital content have permeated post-secondary education,

there has been an extraordinary opportunity for blind students to have equal and mainstream

access to that content as sighted students enjoy. Unfortunately, at some institutions like WVU,

the failure of the university to insist on accessible technology and content, and the failure of

leadership to require faculty and staff to provide accessible materials has resulted in greater

inequality of access than existed when everything was printed on paper. This failure of accessible technology then requires vastly inferior alternate auxiliary aids and services for blind students, such as assistants, notetakers, and readers. Mr. Rogers' and Ms. Lacy's experiences trying to use WVU's resources are emblematic of this failure.

**Mr. Rogers and Ms. Lacy enroll at WVU and request modifications and auxiliary aids and services.**

33.     When Mr. Rogers started at WVU, he requested accommodations and auxiliary aids and services through the Office of Student Accommodations ("OSA"), formerly the Office of Accessibility Services. He specifically sought auxiliary aids and services and reasonable modifications that would allow him to complete his coursework successfully, such as accessible digital materials and textbooks, large print or electronic documents, and extra time on exams.[1] OSA sent letters to Mr. Rogers's professors informing them of Mr. Rogers's need for accommodations and encouraging the professors to meet with Mr. Rogers.

34.     When Ms. Lacy started at WVU, she utilized the same process to request reasonable modifications and auxiliary aids and services. She applied for accommodations through OSA's online portal. Ms. Lacy also requested modifications and auxiliary aids that would allow her to complete her coursework successfully, including the use of assistive technology in class, accessible digital materials and textbooks, and extra time on exams. OSA sent letters to Ms. Lacy's professors informing them of her need for accommodations and encouraging them to meet with her prior to the beginning of the semester.

35.     Mr. Rogers and Ms. Lacy followed the same process each semester they enrolled in classes at WVU. They applied for their modifications and auxiliary aids through the online

---

[1] Additional time on exams is a common policy modification for blind students. Where sighted students may skim written material, blind students using screen readers or braille cannot, resulting in the need for additional time.

portal used by OSA, then met with their professors after OSA sent their professors their accommodation letters.

### Mr. Rogers and Ms. Lacy encounter accessibility challenges while trying to access orientation materials and course textbooks.

36.     The accessibility issues at WVU began as early as new-student orientation. When Ms. Lacy enrolled at WVU, the orientation program consisted of an online set of modules on the Blackboard learning management system. The module platform did not allow her to operate on-screen buttons and controls using JAWS on her laptop, so she could not move through the orientation modules independently. Ms. Lacy raised this problem with her advisor, Jamie Mesar, and the Assistant Director of Accommodations at OSA, Susan Henigin. Ms. Mesar forwarded Ms. Lacy's email about the accessibility issues to the Master of Social Work Program Director, Mary Christensen, and the Online Coordinator, Mandy Weirich. Nonetheless, Ms. Lacy had to ask her teenage son to sit with her and assist her with completing the orientation program.

37.     Prior to the first day of classes each semester, students at WVU purchase textbooks. Mr. Rogers and Ms. Lacy need digital versions of their textbooks to access course readings using their screen readers. To obtain digital textbooks, they are required to purchase hard-copy textbooks and make a formal request for digitized versions through an OSA platform called SAMM. The platform is both burdensome and unreliable; it requires Mr. Rogers and Ms. Lacy to type in long book identifier numbers and often does not function properly, delaying their ability to get the textbooks they need. Mr. Rogers and Ms. Lacy have raised these issues with OSA, but the program has not been made more accessible.

38.     Once OSA receives a request from a blind student for a digitized textbook through SAMM, the office purportedly sends the student accessible PDFs of the relevant textbook.

9

39.     In practice, the OSA system of sending PDFs puts blind students at a disadvantage in terms of keeping up with course readings. Rather than sending one large PDF or a separate PDF of every textbook chapter at the start of the semester, OSA sends Mr. Rogers and Ms. Lacy textbook chapters piecemeal throughout the semester. If a professor's syllabus does not proceed linearly through a textbook, Mr. Rogers and Ms. Lacy have lacked necessary readings whereas their sighted peers have all course readings in their hard-copy books before classes begin. Mr. Rogers and Ms. Lacy have raised these problems with OSA, but they have not been resolved.

40.     To facilitate accessibility, PDF documents can be "tagged" through behind-the-scenes coding that allows a screen reader to proceed through the document's various headings, paragraphs, lists, footnotes, images, and tables in an appropriate order. If a PDF textbook chapter is tagged properly, blind students at WVU can read and navigate their course readings similarly to sighted students. If tags are not included or are not implemented properly to define how the file should be structured, a blind student will not be able to read the book in order and will have to exert significant extra effort to find specific pages and sections.

41.     OSA has sent Mr. Rogers and Ms. Lacy untagged or improperly tagged PDF files, preventing them from processing the material as a sighted student would. Where a sighted student would flip through book pages with ease, Mr. Rogers and Ms. Lacy must scroll through blocks of text using their screen readers to find the correct pages to read. A screen reader also might jump around on an improperly tagged page instead of scrolling through text in order. The process of navigating untagged or improperly tagged PDFs requires Mr. Rogers and Ms. Lacy to spend significantly longer completing their course readings than sighted students. Mr. Rogers and Ms. Lacy have raised this issue with WVU but the problems continue.

42.     PDFs of textbooks from OSA do not provide alternative text or tactile graphics for images. For example, Ms. Lacy once received a PDF textbook that included an image of a brain scan, which students were meant to analyze. The PDF provided no text or tactile graphics to tell her what the scan looked like, and thus limiting her learning opportunity. In another instance, a textbook page prompted readers to analyze a child's handwriting on a greeting card, but there was no alternative text, and Ms. Lacy could not perform the analysis. Mr. Rogers and Ms. Lacy have raised these problems with WVU, but the problems continue.

43.     PDFs of textbooks from OSA sometimes include tables and charts, which need to be tagged in order to convey to the screen reader the order in which to read the columns and rows. OSA's PDFs have been improperly tagged or untagged such that Mr. Rogers and Ms. Lacy's screen readers read the numbers in a nonsensical unordered way, rather than in a comprehensible format. Mr. Rogers and Ms. Lacy have raised these problems with WVU, but the problems continue.

44.     WVU offers students textbook access through an app called Yuzu, which was created by Barnes & Noble. Yuzu has its own built-in screen reader, and it presents digital textbooks in a web interface. Theoretically, the app should be an alternative to the onerous process of requesting digitized textbooks through OSA.

45.     Mr. Rogers and Ms. Lacy have used the Yuzu screen reader to read their textbooks and have found that the in-app play and pause buttons function as expected, and they can generally navigate the book. The books on the Yuzu platform, however, are not fully accessible. Images and figures are not labeled with alternative text that Mr. Rogers and Ms. Lacy can read with their screen readers, and tables are not formatted properly for screen-reader access. Mr. Rogers and Ms. Lacy also cannot access the practice questions within the books on Yuzu

with their screen readers. Mr. Rogers and Ms. Lacy have raised these concerns with WVU, but the problems continue.

46.     Outside of textbooks, professors in the School of Social Work have chosen inaccessible articles as reading assignments, leaving Mr. Rogers and Ms. Lacy struggling to complete their assigned readings. Mr. Rogers and Ms. Lacy have raised these problems with WVU to no avail.

47.     Professors have also circulated inaccessible syllabi and rubrics, which WVU has failed to remediate, resulting in Mr. Rogers' and Ms. Lacy's inability to discern how their professors will evaluate their assignments, putting them at a disadvantage relative to their sighted classmates. Mr. Rogers and Ms. Lacy have raised these problems with WVU to no avail.

**WVU's online learning platforms, including Blackboard and the WVU library website, are inaccessible to blind students.**

48.     WVU uses Blackboard as its learning-management system. Although the school has recently transitioned primarily to using a newer version called "Blackboard Ultra," many current courses are still housed on an older version of Blackboard called "Blackboard Legacy." Mr. Rogers and Ms. Lacy have encountered accessibility barriers on Blackboard (both Ultra and Legacy) every single semester they have been at WVU.

49.     Blackboard layouts are module-based. Course module layouts at WVU are not standardized, so each course might organize its module differently. Because the Blackboard Legacy platform is not fully accessible, Mr. Rogers and Ms. Lacy must try to memorize the layout of each course to find assignments. Ms. Lacy has needed assistance from sighted persons to find documents like rubrics in Blackboard.

50.     The Blackboard platform does not allow blind students using screen readers to navigate through modules the way a sighted student would. The back buttons for modules often

do not function with screen readers, and blind students are not able to move from a module back to the main screen of a course to view assignments and messages. In one of Ms. Lacy's courses, the "Close" button is not coded properly, and she cannot find it using JAWS and her computer keyboard. Accordingly, to move between a module and the main screen of a course, Mr. Rogers and Ms. Lacy have to sign out of Blackboard and sign back in again a time-consuming process that sighted students need not endure.

51.    Blackboard modules sometimes include quizzes for students to complete. Mr. Rogers and Ms. Lacy have found that they cannot select true/false options on questions or pick from a series of answers for multiple-choice questions using their screen readers.

52.    The built-in editor in Blackboard for students to complete written assignments is also difficult to use with a screen reader. Ms. Lacy has been unable to use all the editor's features, such as spell check, that sighted students use, disadvantaging her on graded writing assignments. There are also bugs that make the editor difficult to use with a screen reader. As a blind person types in the edit field, a bug in the website coding prompts the screen reader to read aloud random messages repeatedly, which is distracting and makes it impossible to type without interruption.

53.    On Harmonize, the Blackboard discussion board feature, students in Ms. Lacy's courses have been required to upload presentations for their peers to view. There is no WVU requirement to use an accessible platform, such as PowerPoint, for presentations, resulting in Ms. Lacy's inability to access certain presentations.

54.    WVU has also used VoiceThread, a student collaboration tool that is inaccessible for blind students. Mr. Rogers and Ms. Lacy encountered issues where their peers would post comments on VoiceThread, which would appear on a screen reader as simple text

13

with the posting student's name, no recitation of the comment itself, and no ability to interact with the comment. As a result, Mr. Rogers and Ms. Lacy have been unable to engage with their peers' discussions on VoiceThread.

55.      When Mr. Rogers and Ms. Lacy have tried to post their own comments on VoiceThread, the platform's incompatibility with screen readers results in their comments posting in the wrong place. Their peers thus do not interact with Mr. Rogers's and Ms. Lacy's comments equally as sighted students' comments.

56.      Rather than fixing VoiceThread, WVU singled Ms. Lacy out by emailing the students in her classes and instructing them to send her emails with their posted comments. Her classmates have been inconsistent in taking this extra step.

57.      While sighted students easily accessed digital content on the library's website, Ms. Lacy contacted the library for help using the search function. When Mr. Rogers and Ms. Lacy began at WVU, the library search function was completely inaccessible. The search function now provides minimal accessibility, but Ms. Lacy has tried to use filters in the search bar to search for sources by date, peer review status, etc. The filters are complicated and organized poorly for screen reader use, and it has taken her an hour to apply a filter that would take a sighted student only a few seconds.

58.       To get around the filter issue, Ms. Lacy has to phone the library and ask librarians to retrieve articles for her. The result is that library employees are choosing her articles for her while sighted students select the articles they wish to cite in their academic papers. In addition, library staff is not available at all times when Ms. Lacy wants to do research. Ms. Lacy is effectively locked out of conducting her own independent research and must rely on librarians to investigate topics of interest to her during regular business hours.

59.     WVU students use Handshake, a career-services platform, to schedule meetings with tutors, career advisors, and professors, among other things. Mr. Rogers has experienced significant difficulty using Handshake on his electronic devices.[2] To schedule meetings, Mr. Rogers must call various departments at WVU and ask for help with scheduling whereas sighted students complete their scheduling much more quickly and easily on Handshake. Unlike sighted students, he is limited to regular business hours to conduct these activities.

60.     Mr. Rogers and Ms. Lacy, like other screen-reader users, sometimes have difficulty formatting documents and ensuring that their academic assignments, such as citations, are polished. Screen-reader software sometimes fails to catch improper document margins, a missing quotation mark, a double period, and improper spaces, in documents.

61.     WVU professors deduct grading points for imperfect formatting and citations. WVU does not offer human readers as an accommodation to help blind students access inaccessible materials, programs, and websites or to proofread their work. As a result, Mr. Rogers and Ms. Lacy have to use the WVU Writing Center to have sighted students look over their documents for proofreading purposes.

62.     The Writing Center is not a valid substitute for a reader; it is not always open when Mr. Rogers and Ms. Lacy need assistance.

63.     Mr. Rogers and Ms. Lacy have requested a reader from the School of Social Work and from individual instructors. The response has been occasionally derogatory, and one professor expressed her concerns about Ms. Lacy's ability to complete coursework, stating that

---

[2] Handshake's accessibility issues for students are common. *See Handshake Access Details*, University of Maryland Division of Student Affairs, https://careers.umd.edu/handshake/handshake-access-details ("If you have a Disability and rely on a screen reader or the keyboard for access to your computer, you will experience difficulty using this application.") (last visited Mar. 5, 2025).

she would not get a "person" in graduate school. On other occasions, instructors have been

confused as to why Mr. Rogers would need the accommodation.

64.     When Ms. Lacy requested a reader once again from OSA in February 2025,

OSA staff denied the request.

65.     WVU's failure to provide accessible educational materials and auxiliary aids and

services, and its failure to modify its policies and procedures to prevent discrimination denies

Mr. Rogers and Ms. Lacy an equal opportunity to access and benefit from its programs and

activities, and fails to provide them with equally effective communication, thereby having a

detrimental effect on their ability to succeed in their educational pursuits.

**Ms. Lacy has spent a substantial amount of time—that she could have spent studying or enjoying free time—completing unpaid accessibility testing for WVU.**

66.     As Ms. Lacy encountered accessibility issues during various semesters at WVU,

she promptly raised them with OSA, the School of Social Work, and other University

employees.

67.     Rather than fixing the accessibility issues, the School of Social Work suggested

that Ms. Lacy seek help via a Student Success meeting, which is typically a disciplinary option

for students struggling academically, rather than a viable avenue for disability accommodations.

68.     On several occasions, WVU staff have asked Ms. Lacy to demonstrate and

document her accessibility issues. She has participated in numerous meetings with the school's

accessibility and technology staff testing various electronic platforms for accessibility issues.

69.     Between her enrollment in the fall of 2023 and the end of the fall semester in

2024, Ms. Lacy spent from five to ten hours a week meeting with WVU staff and testing

Blackboard sites and other platforms she struggled to access.

70.     WVU has never compensated Ms. Lacy for the time she has spent on accessibility testing, resulting in her having roughly five to ten fewer hours per week than sighted students to study, spend time with her family, or relax.

**WVU fails to provide accessible technology for choosing field placements and fails to provide accessible field placement sites.**

71.     Students in the Master of Social Work program at WVU complete field training as part of their degree requirements. The "Field Experience" requirement "provides students with opportunities and experiences that demonstrate the multiple and varied roles that social workers perform, as well as day-to-day operations within social, human, and health care agencies, programs, and organizations.[3] These field placements are a cornerstone of preparing students to work with clients and learn directly from practicing social workers.

72.     According to WVU, students in the part-time, General Standing program, like Ms. Lacy, must "complete a 300 hour [] agency placement," constituting 12-16 hours per week, between their first and second years.[4]

73.     Students in the part-time, Advanced Standing program, like Mr. Rogers, "complete 600 hours," constituting 14-16 hours per week, between their first and second years.[5] The Advanced Standing field placements "concentrate more intensively and autonomously in levels of intervention which reflect the elements of the Advanced Integrated curriculum, including work at the micro, mezzo, and macro levels of practice."[6]

---

[3] *MSW Field Experience*, WVU School of Social Work, https://socialwork.wvu.edu/students/field-education/msw-field-experience (last visited Mar. 5, 2025).
[4] *Id.*
[5] *Id.*
[6] *Id.*

74.    Students at WVU pay a $600 fee to gain access to the School of Social Work's field office.

75.    The WVU School of Social Work field education handbook states that students who require disability accommodations must document the accommodations they need in their "Student Field Education Application".[7]

76.    Mr. Rogers documented the accommodations he required on his application in accordance with the handbook. Ms. Lacy attempted to complete the online application and disclose the accommodations she needed, but she struggled to access the application with her screen reader. She ended up filling out the application over the phone with her advisor, who was aware of her accommodation needs.

77.    According to WVU, the field placement team will consider disability accommodations "during the match and placement approval process."[8]

78.    The first step for WVU students embarking on field placements is to register with Tevera, the School of Social Work's online field-management system. Students in the online program, like Mr. Rogers and Ms. Lacy, use Tevera to check for field placement sites pre-approved by WVU in their local areas.

79.    If there is no pre-approved field site in a student's local area, the student must identify an agency themselves, share the agency's name and contact information with WVU, and work with a field coordinator to determine if WVU will approve the agency as a field placement

---

[7] WVU School of Social Work, *Field Education Handbook 2024–2025*, at 26 (May 2024), https://socialwork.wvu.edu/files/d/7b9d9122-6a11-4224-880e-d853e8c25d4c/current-wvu-ssw-field-education-handbook_2024-25.pdf.
[8] *Id.*

site. Stated differently, WVU must review and approve the agencies where students complete their field placements.

80.     The first hurdle for Mr. Rogers and Ms. Lacy in field placement accessibility is Tevera. When Mr. Rogers and Ms. Lacy sought field placements—in 2023 and 2024, respectively—they discovered that Tevera did not work properly with their screen readers. WVU did not offer an alternative to Tevera, requiring Mr. Rogers and Ms. Lacy to spend extra time identifying potential placement agencies.

81.     WVU also uses Tevera for Master of Social Work students to log hours in their field placements. The time-logging function in Tevera was incompatible for both Mr. Rogers and Ms. Lacy's screen readers. Where sighted students quickly filled in blanks in Tevera to log their hours, Mr. Rogers had to spend substantial time navigating the inaccessible version of the app.

82.     Instead of quickly using Tevera like a sighted student, Ms. Lacy had to raise several issues with WVU and ultimately receive help completing tasks on Tevera. She had to ask Ms. Mesar to email a copy of her monthly timesheets to her field placement supervisor for approval because she could not see the timesheets on Tevera like sighted students could. Additionally, her sighted peers seamlessly completed a lengthy document called a learning contract on Tevera; the learning contract prompted students to describe the work they would do at their placement sites. Ms. Lacy informed WVU that the learning contract on Tevera was inaccessible, so the school sent her a copy via Microsoft Word. The Word document was not formatted correctly and therefore was not compatible with Ms. Lacy's screen reader, and she could not complete it independently.

83.     Ms. Lacy completed several unpaid hours of accessibility testing on Tevera at WVU's request in the late Spring of 2024. In June 2024, she spoke to Ms. Mesar about obtaining

a work-around or accommodation for Tevera, which resulted in the implementation of a more-accessible version of Tevera.

**Mr. Rogers was denied modifications and auxiliary aids and disciplined as a result of inaccessibility at his field placement.**

84.     Mr. Rogers attempted to complete his first field placement in the fall of 2023 at an agency called The Counseling Connection.

85.     Mr. Rogers asked the WVU field placement office for help obtaining accommodations at his field placement, but they were unwilling to assist him.

86.     On information and belief, when WVU reviewed the agency as a potential field placement, it did not analyze the agency's ability to provide the accommodations Mr. Rogers would need to successfully complete his placement.

87.     At The Counseling Connection, Mr. Rogers was responsible for taking notes, updating patient files, and assisting with administrative tasks.

88.     The Counseling Connection required Mr. Rogers to use its network-connected computers, rather than his own technology, to complete most of his work there. The agency's computers did not have screen-reader or screen-magnification software.

89.     The agency had one standard computer account for the multiple field placement students to use during their field placements. Mr. Rogers was not able to use assistive technology when accessing agency file systems and networks on the student account. Only one student could use the account at a time, and Mr. Rogers often had to wait lengthy periods of time while a sighted student, who could have used an agency computer, used the singular field placement account, delaying his ability to complete his tasks.

90.     Mr. Rogers asked his field placement supervisor at The Counseling Connection for help obtaining reasonable accommodations, specifically screen-magnification and screen-

reader software, on the agency computers. His supervisor instructed him to use his own computer full-time, despite that his computer would generally not be connected to the agency network, preventing him from doing agency work.

91.      Field placement students at The Counseling Connection were required to work in the front office for a few hours each week sorting patient records, filing documents, and completing other administrative tasks. The lack of a screen reader on the agency computers meant that Mr. Rogers could not sort client files into the necessary folders.

92.       During his placement at The Counseling Connection, Mr. Rogers struggled to log his hours in Tevera given the accessibility issues on the platform.

93.      On Tevera, students specify the type of work activities they complete and how many hours they spend completing them.

94.      On one occasion, Mr. Rogers inadvertently logged 70 hours in Tevera for one individual work activity.

95.      The inaccessibility Mr. Rogers experienced at The Counseling Connection caused him ongoing stress that exacerbated his pre-existing health conditions. The symptoms he experienced caused him to miss field placement hours.

96.      In October 2023, with only two weeks left of required attendance at The Counseling Connection for the semester, Mr. Rogers proposed to his field supervisor that he work remotely for the final two weeks due to the health problems he was experiencing and the inaccessibility of office systems. His supervisor approved the request.

97.      Mr. Rogers continued turning in coursework and doing research work from home and passed the WVU mid-term review of the field placement for the fall 2023 semester.

98.     When Mr. Rogers attempted to return to The Counseling Connection for the spring 2024 semester, the agency terminated him, citing concerns about his attendance.

99.     The School of Social Work called Mr. Rogers to a meeting regarding his academic conduct. At the meeting, the school accused Mr. Rogers of falsifying his timesheets, despite being aware that Mr. Rogers had struggled to use Tevera with his screen-reader and screen-magnification software.

100.     WVU employees also accused Mr. Rogers of falsifying his field placement site supervisor's signature on a memorandum of agreement with the agency. Mr. Rogers explained that he did not realize the document was a binding contract; he believed it was a conceptualization assignment and that he was simply entering his supervisor's name. On his screen-reader software, he believed that he typed the supervisor's name underneath the signature line when, in fact, he typed it above the signature line.

101.     WVU cited these two instances, as well as a concern about Mr. Rogers's professionalism (for which they offered no evidence) to bring academic charges against him. The school placed him on academic probation in February 2024.

102.     The placement at The Counseling Connection was funded through a $5,000 grant from the federal Health Resources and Services Administration.

103.     WVU initially told Mr. Rogers that he would not have to pay back the grant because he finished his placement remotely.

104.     Nonetheless, after he completed his placement and turned in his final assessments, WVU told him that he was responsible for paying the $5,000 grant back out of pocket because he was terminated from The Counseling Connection.

105.    Due to stress over the inaccessibility and negative environment at WVU, Mr. Rogers elected to take a two-semester leave of absence from his Master of Social Work studies in the fall 2024 and spring 2025 semesters.

106.    When Mr. Rogers returns to WVU in the fall of 2025, he must complete a field placement. As of the time of this filing, on information and belief, the school has no plan to provide an accessible field placement.

107.    At the time of this filing, WVU is complicating Mr. Rogers's search for an accessible field placement by mandating that he have an on-site supervisor at his placement whereas other students are permitted to be supervised remotely. This limitation—placed only on Mr. Rogers during his academic review—reduces the likelihood that he will secure a placement that fulfills WVU's requirements.

108.    Mr. Rogers fears that his current lack of a placement, and the inability to secure a WVU-approved, accessible placement in the future, will result in his termination from the Master of Social Work program, leaving him with $50,000 of student debt and no postgraduate degree.

**WVU refused to provide modifications and auxiliary aids for Ms. Lacy at her field placement.**

109.    Ms. Lacy completed her first field placement at the Appalachian Center for Independent Living between June and November 2024.

110.    The Appalachian Center for Independent Living required Ms. Lacy to use its computers, rather than her own technology, to complete her work there.

111.    On information and belief, when WVU reviewed the agency as a potential field placement, it did not analyze the agency's ability to provide the accommodations Ms. Lacy would need to successfully complete her placement.

112.    Ms. Lacy asked WVU to work with the agency—which WVU approved as a field site—to ensure she received reasonable modifications and auxiliary aids there. Namely, she asked WVU to ensure the agency's computers were equipped with the screen-reader software she needed to work.

113.    WVU refused to pay for a license for JAWS at the agency.

114.    As a result, Ms. Lacy was required to work with the agency herself to negotiate providing JAWS on agency computers.

115.    The agency installed JAWS on an older computer located in the back of a hallway at its location. Ms. Lacy was forced to use the isolated computer, limiting her ability to participate meaningfully with her coworkers there.

116.    To meet her hourly requirement, Ms. Lacy must complete a second field placement in the fall of 2025. She has not yet identified a placement. Upon information and belief, the school of social work has no plan for providing her with an accessible placement.

117.    WVU has indicated to Ms. Lacy that it will not provide accommodations for her during her hours at her second field placement site.

**WVU was deliberately indifferent to Mr. Rogers' and Ms. Lacy's accommodation needs.**

118.    Mr. Rogers and Ms. Lacy informed WVU of their disabilities and need for reasonable modifications and auxiliary aids before they matriculated at the school.

119.    Mr. Rogers and Ms. Lacy requested modifications and auxiliary aids from WVU, including accessible books and accessible technology each semester.

120.    Mr. Rogers and Ms. Lacy repeatedly informed WVU of the inaccessibility of the books and technologies it provided and worked extensively with WVU to try to work around or improve their accessibility.

121.    Mr. Rogers and Ms. Lacy requested qualified readers from WVU to assist with accessing inaccessible materials and inaccessible technology.

122.    Mr. Rogers and Ms. Lacy requested that WVU provide reasonable modifications and auxiliary aids, or at least ensure that they were provided, in their field placements.

123.    WVU is and was aware of its legal obligations to provide necessary auxiliary aids and services and reasonable modifications to students with disabilities to ensure their equal opportunity.[9]

124.    Through a combination of assiduous advocacy, education, and litigation, the NFB and other disability rights groups and state and federal agencies have attempted to focus the attention of post-secondary education on meeting the legal and moral imperatives raised by educational technology. The Departments of Justice and Education wrote the presidents of all American post-secondary institutions in June 2010 to advise them that:

> Requiring use of an emerging technology in a classroom environment when the technology is inaccessible to an entire population of individuals with disabilities – individuals with visual disabilities – is discrimination prohibited by the Americans with Disabilities Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) unless those individuals are provided accommodations or modifications that permit them to receive all the educational benefits provided by the technology in an equally effective and equally integrated manner.

125.    Unfortunately, despite this longstanding knowledge of its legal obligation to provide equally effective communication to all students, WVU has its students use emerging technology that is inaccessible to an entire population of individuals with a disability, who, like

---

[9]    *See Laws and Regulations*, WVU Office of Student Accommodations, https://osa.wvu.edu/about/laws (last visited Mar. 5, 2025) ("Accommodations are provided in accordance with the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, as well as other state and federal laws, which require that institutions of higher education provide accommodations and ensure equal access to programs and activities for students with Disabilities.").

Mr. Rogers and Ms. Lacy, cannot see, and without giving them the auxiliary aids and services that would permit them to receive all the educational benefits provided by the technology, much less in an equally effective and equally integrated manner.

126.    WVU failed to provide the needed auxiliary aids and services, accessible and assistive technology, and qualified readers Mr. Rogers and Ms. Lacy needed.

**WVU's disability discrimination harmed Mr. Rogers and Ms. Lacy.**

127.    Mr. Rogers and Ms. Lacy's experiences have been humiliating and demoralizing. In addition, they have not been given an equal and independent opportunity to learn and otherwise participate in and benefit from the WVU experience. In short, WVU has deprived Mr. Rogers and Ms. Lacy of an equal educational opportunity.

128.    Mr. Rogers initially expected to graduate from WVU in August 2024. As a result of the barriers to accessibility at WVU, Mr. Rogers has pushed his graduation date back by nearly two years, to May 2026.

129.    The delayed graduation date represents lost time that Mr. Rogers could have worked in his chosen field. Consequently, Mr. Rogers has lost nearly two years of expected income as a WVU graduate.

130.    Before delaying his graduation date, Mr. Rogers was provisionally accepted into a program that would have paid for his social work license in West Virginia. Because of his delayed graduation date, he was forced to withdraw from the program, losing an important source of funding for his social work license.

131.    One of Mr. Rogers's research courses was so inaccessible that he was hospitalized for mental health treatment due to stress. Although WVU provided Mr. Rogers with a weeklong extension on his assignments after he was released from the hospital, his instructor

failed to grade five of the assignments he submitted pursuant to the extension, which dropped the A grade he previously had in the course.

132.    As described above, Mr. Rogers and Ms. Lacy spend many additional hours outside of class attempting to navigate inaccessible instruction, assignments, and communications—time that their sighted peers spend on studying, electives, extracurricular activities, community involvement, or simple downtime.

133.    For Ms. Lacy, the time burden of WVU's disability discrimination also includes the time she has spent providing free accessibility testing for the school. WVU has not compensated Ms. Lacy for any of this time.

134.    To complete her assignments and to keep from falling behind, Ms. Lacy has had to rely on her family to assist her in accessing course content and reading inaccessible documents and textbooks. Her son, who was a minor during Ms. Lacy's first year at WVU, stepped in and assisted frequently.

135.    Mr. Rogers and Ms. Lacy have paid the same tuition to WVU as their sighted peers, but have received an inferior educational experience due to WVU's failure to uphold its legal obligations. In particular, WVU has failed to educate and train Mr. Rogers and Ms. Lacy in an equally effective manner and prepare them to enter the social-work job market alongside their sighted classmates. WVU has thus deprived Mr. Rogers and Ms. Lacy of the benefits owed to them as tuition-paying students.

## CAUSES OF ACTION

### COUNT I
### Violations of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 et seq.

136.    Plaintiffs incorporate the allegations in the preceding paragraphs as if alleged herein.

137.    The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., guarantees qualified individuals with disabilities an equal opportunity to participate in and benefit from the services, programs, or activities of a public entity. 42 U.S.C. § 12132 *et seq.*

138.    Title II of the ADA mandates, inter alia, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

139.    Furthermore, such public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities. . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

140.     Public entities must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

141.    Under Title II of the ADA, it is discrimination to require use of an emerging technology in a classroom environment when the technology is inaccessible to blind individuals and no equally effective alternative is provided.

142.     WVU, as a state-chartered university, is a public entity under Title II of the ADA.

143.     Classes, class and research materials, and facilities, including online facilities such as the library, at WVU are services, programs, or activities provided by WVU.

144.     Field placements required and approved by WVU are services, programs, or activities of WVU.

145.     Mr. Rogers and Ms. Lacy are individuals with disabilities under the ADA.

146.     Mr. Rogers and Ms. Lacy were admitted to WVU based on all general requirements to be students and are thus qualified individuals entitled to the protections of the ADA.

147.     The NFB and the NFBWV are organizations of blind persons who seek equal access to educational opportunities, including at WVU.

148.     WVU has failed and is failing to meet its obligations to provide blind students with educational opportunities that are equal to those provided to students without disabilities.

149.      WVU has excluded and continues to exclude blind students, including Mr. Rogers and Ms. Lacy, from participation in, denied them the benefits of, or otherwise discriminated against them in its facilities, services, programs, or activities.

150.     WVU has failed to provide necessary auxiliary aids and services, in the form of assistive technology, accessible materials and technologies, and qualified readers to blind students, including Mr. Rogers and Ms. Lacy.

151.     WVU has failed to provide necessary reasonable modifications of polices, practices and procedures to avoid discrimination against blind students, including Mr. Rogers and Ms. Lacy.

152.    WVU's actions constitute intentional discrimination on the basis of a disability in violation of the ADA, in that WVU, with deliberate indifference to the rights of blind students such as Mr. Rogers and Ms. Lacy:

a. Has failed to maintain policies and procedures to ensure compliance with Title II, specifically policies that provide equal opportunity and effective communication to individuals with disabilities;

b. Has failed to ensure that communications with blind students, specifically Mr. Rogers and Ms. Lacy, are as effective as communications with non-disabled peers;

c. Has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination;

d. Has failed to provide reasonable modifications of policies, practices, and procedures;

e. Has imposed de facto vision requirements as eligibility criteria that have the effect of subjecting blind individuals to discrimination in its programs, services or activities;

f. Has purchased and deployed new software that is inaccessible to blind students, including Mr. Rogers and Ms. Lacy, after the effective date of the ADA;

g. Has failed to ensure that third-party sites hosting students for course credit required to graduate provide reasonable modifications and auxiliary aids and services for blind students to complete field placements successfully;

h. Has failed to provide educational opportunities and educational information in a manner that is timely, equally effective, and equally integrated; and

i. Has otherwise discriminated against blind students, including Mr. Rogers and Ms. Lacy.

153.    As a result of WVU's actions, Mr. Rogers and Ms. Lacy have suffered and continue to suffer irreparable harm. They have suffered and continue to suffer from discrimination and unequal access to WVU's programs. Mr. Rogers will not graduate and enter the job market on time. They have been and continue to be denied full access to the knowledge intended to be communicated in their classes.

154.    The actions by WVU were done intentionally or with deliberate indifference to the protected rights of blind students, including Mr. Rogers and Ms. Lacy.

155.    WVU's failure to meet its obligations to provide blind students with educational opportunities equal to those provided to students without disabilities constitutes an ongoing and continuous violation of the ADA and its supporting regulations. Unless restrained from doing so, WVU will continue to violate the ADA. Unless enjoined, WVU's conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

156.    Unless the requested relief is granted, Mr. Rogers, Ms. Lacy, and other blind students at WVU will continue to be discriminated against and denied an equal opportunity to access the educational opportunities, facilities, services, programs, or activities of WVU, and will be unlawfully burdened in their pursuit of higher education.

157.    The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

158.    All Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. Mr. Rogers and Ms. Lacy are also entitled to compensatory damages.

## COUNT II
### Violations of Section 504 of the Rehabilitation Act of 1973
### 29  U.S.C. § 794 et seq.

159.    Plaintiffs incorporate the allegations in the preceding paragraphs as if alleged herein.

160.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

161.    Section 504 defines "program or activity," in pertinent part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . ." *Id.* § 794(b)(1).

162.    WVU receives federal grants, contracts, and other financial assistance, thereby subjecting itself to the requirements of Section 504.

163.    Mr. Rogers and Ms. Lacy are blind and were admitted based on all general requirements to be students at WVU. They are, therefore, qualified individuals with disabilities under Section 504.

164.    WVU has, solely by reason of their disabilities, excluded Mr. Rogers and Ms. Lacy from participation in, denied them the benefits of, and otherwise discriminated against them in its facilities, services, programs or activities. WVU's violation of Section 504 and its

regulations denies Mr. Rogers and Ms. Lacy an equal opportunity to access the public benefit of education at WVU.

165.    WVU's actions constitute intentional discrimination on the basis of a disability in violation of Section 504, in that WVU, with deliberate indifference to the rights of blind student such as Mr. Rogers and Ms. Lacy:

a.  Has failed to maintain policies and procedures to ensure compliance with Section 504, specifically policies that provide equal opportunity and effective communication to individuals with disabilities;

b.  Has failed to ensure that communications with blind students, specifically Mr. Rogers and Ms. Lacy, are as effective as communications with non-disabled peers;

c.  Has failed to provide auxiliary aids and services or to modify policies and procedures to prevent discrimination;

d.  Has failed to provide reasonable modifications of policies, practices, and procedures;

e.  Has imposed de facto vision requirements as eligibility criteria that have the effect of subjecting blind individuals to discrimination in its programs, services or activities;

f.  Has purchased and deployed new software that is inaccessible to blind students, including Mr. Rogers and Ms. Lacy, after the effective date of Section 504;

g.  Has failed to ensure that third-party sites hosting students for course credit required to graduate provide reasonable modifications and auxiliary aids and services for blind students to complete field placements successfully;

h.  Has failed to provide educational opportunities and educational information in a manner that is timely, equally effective, and equally integrated; and

    i.  Has otherwise discriminated against blind students, including Mr. Rogers and Ms. Lacy.

166.    As a result of WVU 's actions, Mr. Rogers and Ms. Lacy have suffered and continue to suffer irreparable harm. They have suffered and continue to suffer from discrimination and unequal access to WVU's programs. Mr. Rogers will not graduate and enter the job market on time. They have been and continue to be denied full access to the knowledge intended to be communicated in their classes.

167.    The actions by WVU were done intentionally or with deliberate indifference to the protected rights of blind students, including Mr. Rogers and Ms. Lacy.

168.    By failing to meet its obligations to provide blind students with educational opportunities that are equal to those provided to students without disabilities, WVU is excluding Mr. Rogers, Ms. Lacy, and other blind students from participating in, and enjoying the benefits of, the educational opportunities, facilities, services, programs or activities offered by WVU.

169.    All Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs. Mr. Rogers and Ms. Lacy are also entitled to compensatory damages.

**CLAIMS FOR RELIEF**

170.    WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

    (a)    An injunction (1) prohibiting Defendants from violating Title II of the ADA and Section 504 of the Rehabilitation Act, (2) requiring Defendants to provide fully accessible textbooks, course materials, library materials, and software in a timely manner; (3) requiring Defendants to provide qualified readers when inaccessible materials are not available; and (4) requiring Defendants to provide auxiliary aids and services and ensure

equally effective communication for individuals with disabilities at their field placement sites;

(b)    A declaration that Defendants have and continue to violate Title II of the ADA and Section 504 of the Rehabilitation Act;

(c)    An award to Mr. Rogers and Ms. Lacy of compensatory damages;

(d)    An award to Plaintiffs of their reasonable attorneys' fees and costs; and

(e)    An award of such other and further relief as the Court may deem just.

Dated: March 20, 2025                          Respectfully submitted,

/s/ *Nicholas Ward*
Nicholas P. Ward (WV Bar No. 13703)
Michael J. Folio (WV Bar No. 6314)
Disability Rights of West Virginia
5088 Washington St W, St. 300
Charleston, WV 25313
Phone: (304) 346-0847
nward@drofwv.org
mfolio@drofwv.org

/s/ *Eve L. Hill*
Eve L. Hill (PHV #55424)
Erin E. O'Neill (PHV #55425)
Julie A. Orozco (PHV #56967)
Brown, Goldstein & Levy LLP
120 E. Baltimore Street, Suite 2500
Baltimore, MD 21202
Tel.: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com
eoneill@browngold.com

*Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs Harold Thomas Rogers, Miranda Lacy, NFB, and NFBWV demand a trial by jury on all causes of action so triable.

/s/ *Nicholas Ward*

Nicholas P. Ward (WV Bar No. 13703)
Michael J. Folio (WV Bar No. 6314)
Disability Rights of West Virginia
5088 Washington St W, St. 300
Charleston, WV 25313
Phone: (304) 346-0847
nward@drofwv.org
mfolio@drofwv.org
